THE BANK OF THE UNIVERSITY *v.* TUCK *et al.*

1. Where the maker of a negotiable promissory note pays the same to the original payee without requiring the production and surrender of the paper, he is liable to pay it again to an innocent holder who acquired title to it in good faith and for value before maturity, unless the payee was the holder's general agent for the collection of such papers, or had special authority to collect in the particular instance, or the money collected in fact reached the holder's hands.

2. There being no evidence that the defendant was in any manner misled or deceived by any act or conduct on the part of the plaintiff, it was error for the court in its charge to give the defendant the benefit of any such hypothesis.

3. There being no evidence to authorize a finding that the payee of the note was the plaintiff's express agent, either general or special, for its collection, the charges complained of, in so far as they deal with the question of express agency, were unwarranted, and not applicable to the issues involved. For a like reason, the charge as to ratification was objectionable.

4. It being, under the evidence disclosed by the record, a question for determination by the jury, whether or not the alleged course of dealing between the plaintiff and the original payee of the note established an implied agency upon the part of the latter to collect the same, it was proper for the court in its charge to deal with, and instruct the jury as to, the law of implied agency.

5. A written transfer by a debtor of promissory notes " as security " for " advances made " by the transferee to the debtor, is ambiguous as to what "advances" were thus secured; and parol evidence having been properly admitted to explain the real meaning of the contract in this respect, the court did not err in giving to the jury appropriate instructions in this connection.

6. If a promissory note, before its maturity, is pledged as collateral security for a particular debt, and such debt is afterwards paid, the holder of the collateral note has then no right to collect it, if the person liable for its payment has already paid it to the pledgor who was the original payee; but so long as any portion of the debt secured by the collateral remains unpaid, the holder of the latter may collect the same, or at least enough thereof to satisfy whatever may remain due on the claim thereby secured.

July 29, 1895.

Complaint on note. Before Judge COBB. City court of Athens. September term, 1894.

The bank sued Tuck as maker, and the Reaves Warehouse Company (a partnership) and R. K. Reaves as indorsers, on a promissory note for $2,200, dated January 20, 1892, due November 1, 1892, and payable to the Reaves Warehouse Company or order. None of the indorsers made any answer. Tuck filed several pleas, the material one being, that he had paid off the note in full of principal and interest, in several payments (giving their dates and amounts), to the warehouse company; and that said company "was the agent of plaintiff, and was duly authorized to collect and receive said moneys, and as such agent did collect and receive the same." Plaintiff demurred on the ground that this plea neither stated that the company had in their possession the note at the time of payment, nor that the money reached the plaintiff, nor that the company were general agents of plaintiff. The demurrer was overruled, and plaintiff excepted. There was a further plea by defendant, that the note was transferred by the warehouse company to the plaintiff as collateral security to secure it in the payment of a note for $10,000 given by the company to the plaintiff in the spring of 1892, on an account for cotton; which note for $10,000 the company fully paid off and settled with the bank in the fall of that year. The jury found for the defendant on the first of the two pleas before stated. Plaintiff's motion for a new trial was overruled, and it excepted.

The warehouse company were cotton factors, and were in the habit of making advances to planters and taking notes therefor. The note sued on was one of this sort. It was pledged by separate writing, April 5, 1892, to the bank, together with five other notes due in October and November, 1892, the whole amounting to over twenty-seven thousand dollars, as security "for and in consideration of advances made us by the bank." It remained in the bank from then until the commence-

ment of this suit, May 29, 1894. Tuck paid it to the warehouse company (about $1,000 in several payments in the fall of 1892, and the balance in August, 1893), without calling for its production for the purpose of entering credits, or its surrender on final payment. He never had any dealings with the bank, and had no notice that the bank held the note until May 16, 1894, when he received a letter from the bank's president asking for payment. He called at the bank's office, and on informing the president that he had paid the note, that officer stated that he was not surprised to learn the fact. This occurred recently after the failure in business of the warehouse company. This company had done business with the bank for a number of years, borrowing from it large sums of money, and occasionally reducing but usually renewing the loans from time to time. These loans were made on the confidence the bank's officers had in the solvency and responsibility of the company; and up to 1888 this was done on open account without other security. Then some of the directors became dissatisfied at the making of such large loans without security; whereupon the company was called on to furnish the same, and did furnish certain notes with a written transfer of them, stating that they were deposited "as collateral security for any and all indebtedness to said bank by the Reaves Warehouse Company, May 12, 1888." These notes were afterwards withdrawn by the warehouse company (which had collected them), and others substituted for them. Some of the testimony indicates that there were deposits or substitutions of notes for those already in the bank as collateral security for the loans owing to the bank by the company, in addition to those mentioned in the two written transfers before described. Any of such collateral notes were surrendered to the warehouse company whenever called for. None were ever collected or at-

tempted to be collected by the bank up to the failure of
the company.    When surrendered, they were given up
at the request of the company or some member thereof,
purely out of accommodation and because the bank had
confidence in them, and considered the debt good with-
out security.    All of such collateral notes would have
been given up had they been asked for.    Sometimes re-
ceipts were taken for them, but usually not.    They were
collected by the company, and the proceeds placed in
the regular channels of their business and not turned
over to the bank.    Many notes were so collected, in-
cluding the one in suit.    Frequently they were in the
possession of the bank, and often in possession of the
company.    One member of the company testified for
defendant, that he could not say positively that the bank
knew the collateral notes were being collected or were
withdrawn for that purpose, but he was satisfied it did
know, as it never called on the company for any of the
notes or their proceeds.    It never objected to such col-
lections.    The company's book-keeper testified, that in
one instance he told the cashier of the bank he wanted
for collection one of the notes other than the one in suit,
and pledged by the same writing.    It was surrendered
to him without objection, and he gave a receipt therefor,
signed in the name of the company.    He was not pre-
pared to say that there was any habit of dealing that
grew out of the paper whereby the transfer of notes as
collateral was made in April, 1892.    The note in suit
was one of only a few that were not withdrawn from
bank.    The bank's officers denied that they or either of
them knew of such collections being made, or authorized
any one to collect the notes, or created an agency of any
sort so to do, or ratified such collection in any case.    It
seems that when the note in suit was paid, nothing was
said as to the possession of it or where it was.    Tuck
paid it on the idea that it was in possession of the com-

pany, and the member of the company who made the settlement testified that he was under a like impression at the time.    The settlement was made by the company's books on which Tuck's account was entered, including entries of the amount of the note.    Many such notes were paid to the company without being taken up, and were simply filed in their office.    The bank's cashier testified, that in the fall of 1891, the warehouse company applied for a loan of $10,000, which was granted, the bank taking as security for it a specific number of bales of cotton represented by a warehouse receipt deposited. The note representing the loan was to be paid at the end of the cotton season, and the matter ran on until the next April, when the bank called for the money. The warehouse company answered that they could not pay it then, and that they had sold the cotton long before; but offered to give other security.    The bank objected that this was not according to their contract, but accepted the security offered, the same being (apparently) the notes transferred by the instrument of April 5, 1892. The $10,000 was paid to the bank in the ensuing fall, which was perfectly satisfactory to it.    The warehouse company never did settle in full their indebtedness to the bank, since they began business; the indebtedness was simply renewed from time to time.    The collateral notes were understood to be deposited to secure any and all indebtedness from the company to the bank.    At the time of the failure the indebtedness was $22,000 principal, represented by three notes, two of which were made by Reaves and indorsed by the other two members of the warehouse company; the other was made by the warehouse company and one of the members of the partnership, and indorsed by Reaves.    On April 14, 1894, Reaves executed a mortgage in favor of a number of creditors including the bank, covering large tracts of land, and various live stock, farming implements, etc.;

the total indebtedness intended to be secured thereby being about $60,000.

The motion for a new trial alleges that the verdict is contrary to law and evidence, and that the court erred in the following charges to the jury :

"If the agent holds himself out and acts for the principal, whether a particular, general or universal agent in his business, and this is done from time to time until third parties dealing with the agent are led to believe by the acts of the agent and of the principal, in using and receiving the benefits, or are led to deal with them by the acts of the principal towards his agent, he could hold the principal bound for the acts of the agent, without any express authority.

"Under the principles of law I have given, if any agency exists, either express or implied, and if a third party deals with an agent individually, believing the agent to be principal and dealing for himself, and at the time he deals with him he has no knowledge of the agency or principal, other than the person he is dealing with, and subsequently the third party so dealing with the agent ascertains that the agency exists and the person dealing with him as principal was agent, then though the agent and principal were concealed, when the agency is ascertained the third party will have the right to go either upon the principal and hold him responsible, or to go upon the agent; and in the scope of the agency, whether particular, general or universal, acts done by the person at the time, who is afterwards discovered to be an agent, would bind the principal, and the principal is responsible for the acts of the agent.

"Collateral deposited for a specific debt, when the specific debt is paid, is not collateral for any other debt that may exist between the same debtor and creditor; and the debtor would have no right to control the collateral until that specific debt was paid, and when paid he would have a right to his collateral.

"If you believe from the evidence that in the spring of 1891 the Reaves Warehouse Co. procured a loan from this plaintiff of $10,000, and to secure the payment of this loan transferred or hypothecated certain cotton to this bank, and that after said note became due the bank called on said Reaves Warehouse Co. for said cotton, or the money arising from the sale thereof, and that said Reaves Warehouse Co. did not then pay said $10,000 note, but had sold the cotton; and if you further believe from the evidence that the Reaves Warehouse Co. then turned over and hypothecated this note of Tuck now sued on, with other notes, as collateral for the payment of this $10,000 note, and that the bank so received them as collateral for the payment of said $10,000 note; and if you further believe from the evidence that thereafter in the fall of 1892, the Reaves Warehouse Co. fully paid off and settled this $10,000 note to the bank, to secure the payment of which this note of Tuck, now sued on, was given as collateral, then I charge you that if the note or debt, to secure the payment of which this note of Tuck now sued on was given, has been paid off to said bank, then said bank would have no further right, title or interest in said note of Tuck so placed as collateral, and in such case the bank would have no right to recover in this suit on said note against the defendant; for if the note of Reaves Warehouse Co., to secure which Tuck's note was placed as collateral, was fully paid off before the commencement of this suit, the bank would have no further right, title or interest in said collateral, and could not recover thereon from Tuck; and this would be true even though the Reaves Warehouse Co. may have owed the bank other notes or debts for which this note of Tuck's was not hypothecated as collateral, if it was not so placed.

"If you find from the evidence that the Reaves Warehouse Co. paid off to this bank the note for which the

note of Tuck was placed with them as collateral, before the suit was brought, then I charge you that the bank would have, after such payment, no further right, title or interest in this note of Tuck so held as collateral, but it would be the property of the Reaves Warehouse Co., though it might be still held by said bank; and the payment of such note under such circumstances by Tuck to the Reaves Warehouse Co. would be a good payment of the note, and under such circmstances neither the Reaves Warehouse Co. nor the bank could recover on this note.

"In the transfer of the note sued on (with others) the following words occur: 'Transferred as collateral security for advances made,' etc. The defendant claims that these words, 'advances made,' are ambiguous, and that the evidence shows that this note of the defendant sued on was hypothecated with the bank to secure an advance of $10,000 made by the bank to the Reaves Warehouse Co., for which the said warehouse company gave their note, and that said note of Tuck was not placed with the bank as collateral for any other debt than the $10,000 note. You will inquire from the evidence how this is. Should you find from the evidence that the note sued on was placed by the Reaves Warehouse Co. with the bank as collateral security for the $10,000 note, and for no other debt, then I charge you that the bank would not have any right as against this defendant to hold this note as collateral on other debts the warehouse company might owe them.

"The question for you to determine under these pleas is whether it was a special, particular deposit for a particular debt, or a general deposit for all debts of the parties. You have before you the documentary and oral evidence, and you will determine that question of fact.

"On the law of ratification I charge you, that where a person has acted for another without authority, hold-

ing himself out to act for another, and does act for him without authority, and the principal ratifies the act and receives the benefit, he will be bound by the act.

"The issue for you to determine is, first, was this a special deposit for a special debt, and has that debt been paid?"

"Defendant claims that it was paid to the Reaves Warehouse Co., who by implication of law were the authorized agents, without having the note in their possession, and that by reason of the course of business between the bank and the Reaves Warehouse Co., the bank had put the company in the position where they could collect and receipt for the money, and were bound by the act. If you believe from the evidence in this case that the Reaves Warehouse Co. were the authorized agents of the bank to collect this note, and it was paid by Tuck to them with or without knowledge, but in fact they were the authorized agents to collect it, then the debt is paid to the bank, and you would find for the defendant.

"If you believe from the evidence, it was deposited for a particular $10,000 debt and it was paid before this suit, and not deposited for any other indebtedness, then your verdict would be for the defendant."

WM. S. BASINGER and JOHN J. STRICKLAND, for plaintiff.

ERWIN & COBB, H. C. TUCK and LUMPKIN & BURNETT, for defendant.

LUMPKIN, Justice.

We do not think the legal questions involved in this case are very difficult of solution. The controversy between the parties was really one of fact, rather than of law. The reporter's statement sets forth a condensed abstract of the pleadings and the evidence. The trial judge committed errors which necessitate another hearing. Our present decision is not intended to be final or

conclusive upon the merits, but the case is left open for the jury to decide under appropriate. legal instructions, which will doubtless be given when the next trial takes place.

1. One who pays a negotiable promissory note, executed by himself, to any person other than the holder, without taking up the instrument, ought to see to it that the person receiving payment has a right to make the collection. By making the note negotiable, the maker expressly contracts to pay the same to any person who may lawfully acquire title to it in due course of trade. He therefore cannot rest upon the assumption that payment to the original payee will necessarily discharge him. Of course, as against one who takes a promissory note after its maturity, the maker may set up the defense that he had already paid it to the original payee before its assignment by the latter; but where one takes such a note before its maturity, such plea of payment will not, in every instance, be available. The rule as settled by the authorities seems to be, that in such a case the holder, notwithstanding the previous payment of the note by the maker to the original payee, may collect it again, unless one of three things appears: first, that the payee was the holder's general agent for the collection of such papers; or, second, had special authority to collect in the particular instance; or, third, that the money collected by the payee in fact reached the holder's hands. It will be obvious, without further elaboration, that if the payee collected for the holder under his authority, either general or special, or if the holder actually received the money collected by the payee upon the note, this should be an end to the matter. Otherwise, the law renders the careless maker liable to pay a second time.

2. There is not a particle of evidence in the record authorizing even an inference that the bank, which was the plaintiff below, did anything whatever to deceive

v 96-30

Tuck, the maker of the note, or to mislead him into the belief that the Reaves Warehouse Company, the payee of the note, was in any sense the agent of the bank for its collection; or, that in making payment to the warehouse company, Tuck was influenced by any act or conduct on the part of the bank. The court therefore erred in giving to him by its charge the benefit of any such hypothesis.

3. It will also appear from an inspection of the record, that the question of express agency for the bank on the part of the warehouse company was not involved in this case at all. There was absolutely nothing in the evidence to show that the bank had in express terms ever made the warehouse company its general agent for the collection of papers of this kind, or for any other purpose, or had specially authorized it to collect this particular note from Tuck. Nor was there any evidence of ratification by the bank of such collection. It follows that certain of the charges complained of, relating to the subject of express agency and of ratification, while they may in the abstract have been correct propositions of law, were not at all applicable to the facts in issue, and ought not to have been given.

4. Without intending to express or to intimate the slightest opinion as to how the jury should have found, we think there was evidence sufficient to authorize the submission to them of the question as to whether or not the alleged course of dealings between the bank and the warehouse company was sufficient to establish an implied agency for the collection, by the latter, of the note in controversy. The court therefore did not err in dealing with this question in its charge to the jury, and the instructions given in this connection were substantially correct.

5. It appears that the note of Tuck, with others, was transferred in writing by the warehouse company to

the bank "as security" for "advances made" by the bank to the warehouse company. We think it clear that this instrument was ambiguous as to what "advances" were thus secured. Parol evidence to explain the meaning of the contract in this respect was therefore properly received, and the court appropriately instructed the jury in this connection.

6. We deem it unnecessary to discuss the rule announced in the 6th head-note. The correctness of what is there said is too obvious to be seriously questioned.

*Judgment reversed.*