## BANK OF THE UNIVERSITY *v.* TUCK.

1. The maker of a negotiable promissory note pays the amount due thereon to any person other than the holder at his own risk, and a defense to an action on such note setting up payment to one authorized by the holder to collect for him casts upon the defendant the burden of showing not only that he has paid the money, but that he has made payment to a person authorized by the holder to receive it, or else that it actually reached the holder's hands.

2. In the present case there was no evidence from which the jury could rightfully infer that the person to whom the alleged payment was made, was the agent of the holder, or was authorized generally or specially to receive for it payment of the note, or that the holder ever received the money; and consequently, a verdict finding in favor of the defendant upon his plea of payment was contrary to law, and should have been set aside.

Argued April 15, — Decided May 7, 1897.

Complaint on note — certiorari. Before Judge Hutchins. Clarke superior court. April term, 1896.

*W. S. Basinger* and *J. J. Strickland*, for plaintiff.

*Lumpkin & Burnett, Erwin & Erwin* and *H. C. Tuck*, for defendant.

ATKINSON, J. The Bank of the University brought suit in the city court of Clarke county against W. R. Tuck, upon a promissory note executed by him on the 20th day of January, 1892, in favor of the Reaves Warehouse Company or order, for $2,200.00, besides interest, costs and attorney's fees which might be incurred in collecting the same ; which note had been endorsed to it by the Reaves Warehouse Company, the payee.

Among other matters set up in his plea, which matters it will not be necessary for the purposes of the present discussion to consider, the defendant filed a plea of payment. He alleged that the note sued upon had been fully paid off and discharged in consequence of payments made by him to the Reaves Warehouse Company, the original payee, upon specified dates, of sums specified, aggregating in amount the entire principal and interest due on the note. The defendant alleged further, that the Reaves Warehouse Company was the agent of the plaintiff, and was duly authorized to receive and collect said moneys and as such agent did collect and receive the same. The defendant, having assumed the burden of proof, proceeded to introduce evidence in support of his plea. The evidence introduced by him was, in substance, as follows.

Wm. R. Tuck, the defendant, himself testified : I gave this note (the note sued on) to the Reaves Warehouse Company. I paid the note to the Reaves Warehouse Company, commencing to pay in the fall after I gave it, and finished in Aug., 1893. The dates of the payments were as follows : Oct. 15, 1892, $552.02 ; Nov. 3, 1892, $215.42 ; Nov. 4, 1892, $55.00 ; Nov. 13, 1892,

$300.00; Aug. 8, 1893, $1,272.31. I paid in money and cotton and drafts, except the last payment for which I gave a new note. About a month after the failure of the Reaves Warehouse Company I received a notice from the Bank of the University about this note. I did not know that the bank held it. The notice was in the shape of a note from Mr. Phinizy, president of the bank, calling upon me to pay it, which I have lost. The company's failure took place in April, 1894. I went at once to see Mr. Phinizy, and told him I had paid the note to the Reaves Warehouse Company. I had been in the bank frequently between the date of the note and the failure. Mr. Phinizy said, when I told him I had paid it, he was not surprised. I had paid the note for $1,272.31 now sued on by the National Bank, also to warehouse company prior to the failure. — Cross-examined, the witness said : Some of the payments were made before the notes were due and some afterwards ; all were made to the Reaves Warehouse Company. I did not know where the note was when I made the payments — supposed it was at the warehouse. I did not pay it to the Reaves Warehouse Company as agents of the bank, but as a debt I owed themselves. I never heard that they were agents for the bank — they did not claim to be so. I did not know of any course of dealing between them and the bank. I paid the company because I supposed they held the note, and did not ask whether they had it or not.

W. T. Bryan, sworn for the defense, testified : I was bookkeeper for the Reaves Warehouse Company from 1889 to their failure on April 14, 1894. During this time the company borrowed money from the Bank of the University, deposited money there, and drew checks on the bank. Some of the money borrowed was secured by transfers of notes of different parties, held by the company. The company endorsed such notes and delivered them to the bank as collateral security. Transactions of this sort didn't occur every year. I can not say what amount of notes was thus transferred during the whole time I was bookkeeper. Referring to a paper (mentioned afterwards) he said there was $27,473.22 in this lot. There were others, but I don't remember the amounts — may be $50,000.00, more or less. — The defendant here introduced papers, copies of which,

marked A and B, are given at the end of the oral testimony. The witness, referring to these papers, said : I don't know that these papers show all the notes ; there may have been others. The Reaves Warehouse Company owned the notes thus transferred. The bank never collected any note deposited with it by the company as collateral security while I was bookkeeper for the company. When such notes were withdrawn the company did it. I withdrew one, the Spratling note. The McRee note was also withdrawn. The note of Tuck sued on is in this paper (B). When I went to the bank to get the Spratling note, I told Mr. Hull, the cashier, that I wanted to take it out for collection ; that Spratling was dead and his executors wanted to pay it. I withdrew the note, collected it and put the money in the company's business ; the bank never demanded it. The debt of the company to the bank, for which Tuck's note was held as collateral, was never paid in full. $20,000 behind when warehouse failed. None of these collateral notes were ever paid directly to the bank. The money due on them when collected by the company was credited to the maker and used in the regular course of business. I never took the money collected on a note, carried it to the bank and took up the note. When we had settlements with the bank our notes would be renewed or paid ; if paid, it was with money arising from the general business. Q. Did the bank know you were collecting these notes? A. Yes, I told you I went to the bank and told Mr. Hull that I wanted the Spratling note for collection. — Cross-examined, the witness said : The notes placed with the bank as collateral were not credited to the company and did not affect the account of the company in any way, whether one was withdrawn or not. They were placed with the bank as security for the debt of the company to the bank. The Spratling note was withdrawn with the bank's consent for collection ; it was collected for the company, not for the bank. I don't remember whether I withdrew the McRee note ; that was withdrawn for the purpose of taking a judgment with the bank's consent. The effect of the withdrawal of these notes was to release them from the pledge of them as security and lessen the security to that extent. These are the only two I remember.

These collateral notes remained in the bank various lengths of time — after maturity as well as before. The bank never called on the company to pay the Tuck note, or any of the collateral notes. The indebtedness of the warehouse to the bank was represented by notes ranging from thirty to ninety days. When one would fall due, the warehouse would pay the interest and renew the note or pay the note.

W. D. O'Farrell, for the defense, said : I am one of the firm of the Reaves Warehouse Company. It had dealings with the bank since its organization, about eight years before failure. The dealings between the bank and the company were as follows : The company would take a note from one of its customers ; all such notes were the property of the company. When the company was overchecked, the bank would call on them for some notes to make a showing to the directors. We then deposited notes at the request of the president of the bank, as a matter of accommodation to the bank. We knew when a note was due. If a customer came in to take up his note, we had the bills-receivable account to show him and the note was paid to the Reaves Warehouse Company. We frequently had collateral notes there to amount of $50,000 or more. I am certain we were never called upon to pay any of these collateral notes. They were taken up at intervals as the company saw fit ; the company was never urged by the bank on these notes, nor any one giving them. The company collected such notes ; the bank never did. I have no reason to doubt that the bank knew that the company was collecting these notes ; for on several occasions I have gone to the bank and withdrawn them, not to return them or to pay them, but stating that I wanted them for collection. My recollection is Mr. Hull would make a note of the matter and attach it to the papers. The bank never demanded payment of the company of any such notes. They would stay in the bank sometimes a year or a year and a half. The bank never said anything to us about collecting these notes ; the company collected them whether due or not. The bank never called on us for any money collected on these notes. The collateral notes were taken out at intervals as the warehouse company saw fit. The bank collected none of these notes of the

makers. — Cross-examined, the witness said : Withdrawing collateral notes from the bank did not affect the debt due by the company to the bank in any way ; it only decreased the security. The collections we made on notes that had been placed with the bank as collateral were made for the company. When we withdrew notes for collection, it was to collect them for ourselves. When we took them out, they were released from the pledge and the bank had no further interest in them. When we placed them with the bank, I don't know whether we expected the bank to collect them, or that we considered that matter. If we had put a government bond in the bank as collateral, we would not have expected the bank to sell the bond till the debt secured by it was due and unpaid ; the bank couldn't do that ; if the debt was renewed they couldn't sell the bond. The fact on which I base my statement that the bank knew we were collecting the notes placed with it as collateral is, that when a party who had given the company a note wanted to settle, and it was in the bank as collateral, we went there and got it without objection. When the Tuck note was paid the company did not have it ; the payments were made to the Reaves Warehouse Company for its own account. We did not undertake to collect it as agents for the bank — were not acting, in collecting it, in the capacity of agents ; we were not trying to represent the bank ; we stated nothing to Mr. Tuck about any authority to represent the bank — did not report to the bank that we had collected it. No questions were asked by the bank when we would get these collateral notes, whether we were going to bring the money back to the bank or how we were going to pay it. — On redirect he said : We collected these collateral notes because the parties owed the company and wanted to settle — because they were due to the company. We collected the notes that were in the hands of the bank because we had the "bills receivable" and account against the customer. No one else was trying to collect them ; the bank was making no effort to do so. The note sued on was never withdrawn from the bank. Tuck paid the note to the Reaves Warehouse Company before the failure. The warehouse company received the money and received the benefit from it.

The papers referred to by the witness Bryan, and mentioned in the above brief of his testimony as marked A and B, are here set forth:

Athens, Ga., May 12, 1888.

For value received, we hereby transfer to A. L. Hull, cashier, the following notes:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| J. W. Jarrell, | Dated Mch. | 30, | '88, | due Nov. | 1, | '88, | | $1,946.34 |
| E. A. Barnett, | " | Apr. | 13, | " | " | " | 15, | " | 1,000. |
| McGaughey, Jenkins and McGaughey, | " | " | 17, | " | " | " | 1; | " | 2,000. |
| Malsby & Avery, | " | " | 25, | " | " | " | " | " | 600. |
| J. R. Boswell & Son, | " | " | 21, | " | " | " | " | " | 1,004.55 |
| Thos. E. Fortson, | " | " | " | " | " | " | " | " | 1,986.96 |
| James E. Randolph, | " | " | 18, | " | " | " | " | " | 938. |
| McMahan & Wilkins, | " | . " | 19, | " | " | " | " | " | 500. |
| Malsby & Avery, | " | " | 9, | " | " | " | " | " | 1,000. |
| Jesse White, | " | . " | 10, | " | " | " | " | " | 500. |
| W. M. & H. A. Hays, | " | Feb. | 23, | " | " | " | " | " | 436.07 |
| Hugo Phillips, | " | Apr. | 26, | " | " | " | " | " | 1,000. |
| R. M. McAlpin & Co., | " | " | 21, | " | " | " | " | " | 4,572.70 |
| J. M. Callan, | " | " | 30, | " | " | " | " | " | 959.44 |
| Hanton & O'Kelly, | " | " | " | " | " | " | " | " | 1,000. |
| Jno. W. Semour, | " | May | 4, | " | " | " | " | " | 961.22 |
| Comer & Carr, | " | " | 1, | " | " | Dec. | 1, | " | 3,500. |
| R. B. Burgess, | " | " | 7, | " | " | Oct. | 15, | " | 303.93 |
| " | " | " | " | " | " | Nov. | 1, | " | 303.93 |
| " | " | " | " | " | " | Dec. | 15, | " | 303.94 |

The foregoing notes are deposited with the Bank of the University as collateral security for any and all indebtedness to said bank by the Reaves Warehouse Company.

May 12th, 1888.          Reaves Warehouse Company.

W. D. O'Farrell.

Substituted for above:

| | |
|---|---|
| Hunnsells, Power & Co., | $8,000. |
| Irwin, Callan & Co., | 2,500. |
| W. A. Quillian & Co., | 2,000. |
| Comer & Carr, | 6,351.12 |
| McMahan & Wilkins, | 2,000. |
| E. S. O'Brien, | 1,800. |
| " | 1,800. |
| " | 1,800. |
| | 26,251.12 |

Reaves Warehouse Company.

D. Jankower.

The words "taken out" were written opposite the names of McGaughey, Jenkins & McGaughey, Malsby & Avery, J. R. Boswell & Sons, Malsby & Avery, Hugo Phillips and R. B. Burgess, in the handwriting of A. L. Hull, cashier, and in pencil.

Athens, Ga. April 5, 1892.

For and in consideration of advances made us by the Bank of the University, we hereby transfer to A. L. Hull, cashier, the following notes as security :

```
W. R. Tuck,        Dated Jan.  2/92, payable Nov. 1/92, $2,200.    int. pd. 8%
J. G. McRee,         "    Dec. 26/91,    "      "     "  1,263.76,  "    "    "
J. W. Spratling,     "    Mch. 15/92,    "      "     "    676.13,  "    "    "
W. B. Power &  }     "    Dec.  3/91,    "      "     "  7,333.33,  "    "    "
H. O. Williford, }
Reaves & Carlton,    "    Feb. 23/92,    "     Oct. 1/92, 8,000.    "    "    "
   "        "       "    "    "   "     "     Nov.  "     8,000.    "    "    "
```

Witnessed by　　　　　　　　　　R. K. Reaves,
　　W. T. Bryan,　　　　　For Reaves Warehouse Company.
　　Notary Public, C. C., Ga.

May 12th, 1892, received of A. L. Hull, cashier, note of J. W. Spratling, $676.13.

　　　　　　Reaves Warehouse Company, By W. T. Bryan.

On the back of statement of transfer appears this :

Dec. 30, 1892, received of A. L. Hull, cashier, J. L. McRee note for $1,263.76.　　　Reaves W. H. Co., By W. T. Bryan.

There was a verdict for the defendant. The plaintiff made a motion for a new trial, which being overruled, it sued out a writ of certiorari, which being in turn overruled, it excepted.

The proposition announced in the first headnote which precedes this opinion is so well established that it may almost be said to be axiomatic. We therefore neither undertake to discuss it, nor to cite any of the innumerable authorities which might be quoted in support of it. Indeed, the entire case, including the proposition above referred to, was practically decided and settled by the decision of this court in this case when it was here for review upon a former writ of error. (See 96 *Ga.* 456.)

The whole question of the defendant's liability to the plaintiff depends upon whether the Reaves Warehouse Company was the agent of the bank, either express or implied. It being a pledgee for value of the note, and the money having confessedly not been paid to it, but to the original payee, it follows that to excuse the maker from liability to the pledgee, he is bound to prove the agency of the person to whom he paid the money, and the competency of that person for and on behalf of the bank to receive it.

There was no evidence at all that the payee of the note was given express authority by the bank for and on its behalf to

collect the money; and if an agency exist, it must of necessity arise from implication, and be predicated upon the course of dealings between the bank and the payee. Implied agency may rest either upon the presumption of agency, or upon the doctrine of estoppel; and in order to support such an agency, the evidence must be such as to show either that the course of dealings between the alleged principal and agent was of such a character as to raise an inference of an agency either general or special, or the course of dealings has been such as to mislead one into treating another person as the agent of yet another person to the prejudice and injury of the person misled. It is of the essence of such an estoppel, that the person claiming to have been misled should have acted upon the belief that the person misleading him was acting for and on behalf of the person against whom he seeks to raise the estoppel; for, unless the alleged agent professed so to act, or the person injured was induced by some conduct of the alleged principal to treat the person injuring him as the authorized agent of the principal, then certainly no estoppel could arise. Mechem on Agency, §§ 83 and 84. According to his own testimony, Tuck, the defendant, did not know that the bank held the paper until after it had been fully paid off by him, but on the contrary supposed that it was at the warehouse. He says expressly that he did not pay the money to the Reaves Warehouse Company as the agents of the bank, but as a debt that he owed them; that he never heard that they were agents for the bank; that they did not claim to be so; that he did not know of any course of dealing between them and the bank; but that he paid the money to the payees because he supposed they held the note, and did not ask whether they had it or not. So far then as this defendant is concerned, it is manifest that no such estoppel arises against the bank as would raise and support a presumption of an implied special agency in the Reaves Warehouse Company to collect, for and on behalf of the bank, this particular note. It was insisted, however, that the evidence of the general course of dealing between the bank and the Reaves Warehouse Company, with respect to other debtors of the latter company whose papers had been pledged to the bank as

collateral security, was such as to raise an inference of a general authority upon the part of the Reaves Warehouse Company to collect for the bank moneys due upon any papers pledged by it to the bank as collateral security. We do not think there is any evidence to support this theory. According to the testimony of the officials of the bank, and as well of the Reaves Warehouse Company, the latter company, in making collections from their debtors, did not act or profess to act for and upon behalf of the bank. Indeed this theory is entirely negatived by the course of dealing between the parties, for the reason that in the only two instances in which the Reaves Warehouse Company professed to act for the bank, the bank created an express agency for that purpose by delivering to it for collection the notes which had been pledged as collateral security by the Reaves Warehouse Company. The facts here in the record make a case of peculiar hardship as against the defendant; but it is obvious, from his own account of the transaction and from the account which his own witnesses give of the dealings between the parties, that the bank is in no way answerable for the consequences of his own indiscretion in paying to the Reaves Warehouse Company money upon account of a promissory note which it did not have in its possession at the time it demanded payment from him. Slight attention to this important matter would have protected him against the imposition which has been practiced upon him; and obviously, as between himself and the bank, which in no manner participated in the wrongful act, the latter ought to prevail.

*Judgment reversed. All the Justices concurring, except Cobb, J., disqualified.*