### 8503. SHERROD *v.* SPRINGFIELD BAPTIST CHURCH.

1. Where payment on a written evidence of debt is made to a person as agent for another, the production of the written evidence of debt raises an implication of his authority to receive the payment as agent, but where it is not produced there is no such implication, and the burden is upon the person making the payment to establish such authority.
2. Declarations of an alleged agent are not by themselves admissible to prove agency, but the fact of agency may be established by proof of circumstances, apparent relations, and the conduct of the parties; and where the extraneous circumstances, independently of and without regard to the declarations of the agent himself, clearly tend to establish the fact of his agency, his declarations, though inadmissible if standing alone, may, as a part of the res gestæ of the transaction, be considered.
3. Where it is shown that a payment so made reaches the hands of the principal, or the hands of another who is his authorized agent to receive it, the authority of the person to whom the money was actually paid need not be shown.
4. Under the ruling stated in the second headnote, the admission of the receipt signed by Armstrong as agent was not erroneous. Nor do we think the court expressed any opinion as to the evidence; nor was the charge upon the subject of agency erroneous in itself, or so inadequate as to require a reversal on that ground, it not appearing that a request for more specific instructions on this issue had been made.

DECIDED NOVEMBER 2, 1917.

Complaint; from Richmond superior court—Judge H. C. Hammond. January 1, 1917.

This was an action brought by W. L. Sherrod of Enfield, North Carolina, against a church of colored people at Augusta, Georgia, known as Springfield Baptist Church, for a balance of $1500, with

interest and attorney's fees, on a note secured by a deed to real estate in the city of Augusta. The defendant pleaded payment, contending on the trial that the note, which originally was for $3,000, had been fully paid and discharged by two separate payments,—one for $1,620 at an interest period, July 1, 1913, which included $1,500 on the principal and $120 as six months' interest on the entire debt, and the other a payment of $1,620 which included the principal sum of $1,500 and $120 as one year's interest. This latter payment was made shortly before the suit was filed, and was accepted by the plaintiff without prejudice to his right to sue for and recover the amount in controversy, which is a sum equal to the amount of the payment alleged to have been made by the defendant on July 1, 1913. The defendant had borrowed about $3,000 from the Irish-American Bank, of which James P. Armstrong was cashier. Armstrong notified the church committee that the bank desired its money, and that he would secure a loan of $3,000 from another party, and they could thus pay the debt to the bank. This offer was accepted, and the church officials signed up the papers, giving a note dated July 1, 1910, for $3,000, due five years after date, and payable to the order of W. L. Sherrod, at the Irish-American Bank, Augusta, Ga. Semiannual interest notes at 4% per annum were also signed up. This transaction was consummated at the bank between the defendant and Armstrong, neither the plaintiff nor any other person representing him being present. It was provided by the terms of the note that the maker should have the privilege of paying $1,000 on the principal at any interest paying period, provided the church corporation gave to Sherrod thirty days notice in writing of its intention so to do, interest to run only on unpaid balance.

When the various interest notes fell due, January 1, 1911, July 1, 1911, January 1, 1912, July 1, 1912, and January 1, 1913, they were regularly paid at the Irish-American Bank by turning the money over to Armstrong, cashier. The evidence for the defendant shows that sometimes the interest notes were turned over to it when paid, and sometimes a receipt was given to it for the amount paid, and the notes delivered to it later. The evidence shows that Sherrod, the lender of the money, had a son-in-law, H. L. Salsbury, who resided in Augusta, and was the general agent of his father-in-law in making loans for him at Augusta,

and in paying out the money and collecting loans.  The plaintiff himself testified that Salsbury had authority to make the collection of the debt in question.  The evidence of the plaintiff shows also that he would send the interest notes to Salsbury as they were called for by him, and Salsbury testified that a week or ten days before the notes would become due he would deposit them in the Irish-American Bank in order that they might get out notices to debtors, and that the bank was to collect them and place the amount to his credit, and he would in turn mail to the plaintiff a check for the amount collected, and that this was done in the case of this defendant.  Although he afterwards sought to qualify the statement, the plaintiff himself testified as follows: "Mr. Salsbury never wrote me to send him a note until after it was due and the interest was paid.  After the interest note was due and the interest was paid, I would send him a note in settlement of the interest in that way."  The evidence shows that no one representing the defendant met the plaintiff or Salsbury, his admitted agent, until after the interest note maturing January 1, 1914, was presented, all of the transactions having been effected at the bank with Armstrong.  The evidence shows that some time two or three months previous to July 1, 1913, the officials of the church asked Armstrong if it would be satisfactory to Mr. Sherrod for them to pay $1,500 on the note.  Armstrong replied that he supposed it would be, but he would make inquiry and let them know.  In a few days he informed them that it was satisfactory, and the payment could be made, and it is not disputed by any one that on July 2, 1913, the church actually paid over at the Irish-American Bank to James P. Armstrong, cashier, the $1,620 and took a receipt as follows:

"$1,620.00.                    "Augusta, Ga., July 2, 1913.

"Received of Springfield Church sixteen hundred and twenty ($1,620.00) dollars, $120.00 applied on interest to date and $1,-500.00 on principal of $3,000.00.

"W. L. Sherrod, by J. P. Armstrong."

The plaintiff contends that neither the Irish-American Bank nor Armstrong, its cashier, had any authority, express or implied, to receive the payment in question; that neither of them at any time held the security deed or the principal note for collection, and that neither he nor his agent, Salsbury, knew that the defendant

had attempted to make payment at the bank or to Armstrong on the principal indebtedness until the serial interest note maturing January 1, 1914, was presented, after the bank had failed and had been placed in the hands of the State bank examiner; at which time the defendant declined to pay the note, on the ground that the principal indebtedness had been reduced by one half six months previous by the payment then made at the bank.

The testimony further showed that Salsbury carried an account on the books of the Irish-American Bank in his own name, and that he deposited to this account the various sums of money received from Sherrod to be loaned out, and the sums paid back. The defendant introduced in evidence this account on the books of the bank, which showed that on July 2, 1913, the $1,620 was entered to the credit of H. L. Salsbury, which date was nearly five months previous to the bank's failure on December 13, 1913; and the book showed other transactions by Salsbury which indicated that he had used this sum by checking on it, and that after the deposit of the payment in dispute to Salsbury's account, an overdraft in his account at one time appeared. Salsbury testified that his pass-book, check-book, and cancelled checks were destroyed by fire, and, although he acknowledged receipt of the $120 interest paid on July 2, 1913, and admitted that this payment appeared on his pass-book, he said that the $1,500 was not placed on his pass-book until it was presented to the receiver of the bank to be balanced, and when it was put upon his book he repudiated it and returned the book to the receiver of the bank, and declined to accept it. He testified also that his pass-book had been balanced several times between the time the payment was made on July 2, 1913, and the failure of the bank on December 13, 1913, and denied the correctness of the account which showed that he had used the $1,620 by checking on it. When the books of the bank were balanced, after the failure of the bank on December 13, 1913, there appeared to the credit of H. L. Salsbury's account the sum of $3,076.70. Salsbury contended that this was $1,500 too much, on the ground that Armstrong had no authority to accept the money.

The defendant, claiming that the payment of $1,620 to Armstrong was legal and binding on the plaintiff, subsequently paid up the entire balance of the debt that was due, leaving open only

one question, namely, the legality of the payment of that $1,620. On that issue the case went to trial, and the jury found in favor of the defendant. The plaintiff filed a motion for a new trial, which was overruled, and the case is here on exception to that judgment.

*Alexander & Lee,* for plaintiff.    *W. H. Fleming,* for defendant.

JENKINS, J. (After stating the foregoing facts.)

1, 2. The fact that a person assuming to be the agent of another receives payment from the debtor on a written evidence of debt does not raise an implication of his agency, where he does not produce the written evidence of debt itself (Civil Code of 1910, § 3578); nor is such agency established by the declaration of the alleged agent (*Harris Loan Co.* v. *Elliott & Hatch Co.,* 110 *Ga.* 302 (34 S. E. 1003); *Americus Oil Co.* v. *Gurr,* 114 *Ga.* 624 (40 S. E. 780); neither does such implication arise when it is shown that the alleged agent was the medium through whom the money was originally passed to the debtor, and that the instrument was taken by such person. *Howard* v. *Rice,* 54 *Ga.* 52. Such agency does not follow from the fact that partial payments have hitherto been made by the debtor to the person assuming to act as such agent, where on each former occasion the agent produced the evidence of indebtedness (*Walton Guano Co.* v. *McCall,* 111 *Ga.* 114, 36 S. E. 469); nor from its being shown that the evidence of indebtedness provides that payment shall be made at the particular bank of which the alleged agent is cashier. 7 C. J. 587, § 243. The fact, however, that from none of these things does agency follow does not prevent one who has made payment to a party assuming to be the agent of the creditor from establishing such relationship by proof of circumstances, apparent relations, and the conduct of the parties. *Cable Co.* v. *Walker,* 127 *Ga.* 65 (56 S. E. 108). And thus, where the independent and extraneous fact is made to appear, that in the course of previous dealings with the debtor the alleged agent received payment of various interest notes without having possession of them, and that the payments were subsequently ratified by the creditor and the interest notes thereafter delivered, all of the facts and circumstances above enumerated can then be properly considered by the jury as throwing some light upon the question of agency involved. *Abel* v. *Jarratt,* 100 *Ga.* 732 (28 S. E. 453); *Ham* v. *Brown,* 2 *Ga. App.* 71 (58 S. E. 316). In the case of *Bank of the Univer-*

*sity* v. *Tuck,* 96 *Ga.* 456 (23 S. E. 467), it was said: "It being, under the evidence disclosed by the record, a question for determination by the jury, whether or not the alleged course of dealing between the plaintiff and the original payee of the note established an implied agency upon the part of the latter to collect the same, it was proper for the court in its charge to deal with, and instruct the jury as to the law of implied agency." The charge of the trial court referred to in that case, and which was approved as substantially correct, was as follows: "If the agent holds himself out and acts for the principal, whether a particular, general or universal agent in his business, and this is done from time to time until third parties dealing with the agent are led to believe by the acts of the agent and of the principal, in using and receiving the benefits, or are led to deal with them by the acts of the principal toward his agent, he could hold the principal bound for the acts of the agent, without any express authority."

The principle here applicable has been stated by the Supreme Court of the United States in Bronson's exr. *v.* Chappell, 79 U. S. 681, 683 (20 L. ed. 436), as follows: "Where one without objection suffers another to do acts which proceed upon the ground of authority from him, or by his conduct adopts and sanctions such acts after they are done, he will be bound, although no previous authority exist, in all respects as if the requisite power had been given in the most formal manner. If he has justified the belief of a third party that the person assuming to be his agent was authorized to do what was done, it is no answer for him to say that no authority had been given, or that it did not reach so far, and that the third party had acted upon a mistaken conclusion. He is estopped to take refuge in such a defense. If a loss is to be borne, the author of the error must bear it. If business has been transacted in certain cases, it is implied that the like business may be transacted in others. The inference to be drawn is, that everything fairly within the scope of the powers exercised in the past may be done in the future, until notice of revocation or disclaimer is brought home to those whose interests are concerned. Under such circumstances, the presence or absence of authority in point of fact is immaterial to the rights of third persons whose interests are involved. The seeming and reality are followed by the same consequences. In either case the legal result is the same."

Another case in point is that of Wilcox v. Carr, 37 Fed. 130, wherein the payment to a sub-agent in Iowa (without possession of the written evidence of debt) was held good, notwithstanding the paper itself called for payment at the agent's office in Connecticut, and the money never reached that State, but was embezzled by the sub-agent in Iowa. The court lays stress on the payment of the money due on the coupons or interest notes to the same agent and the subsequent delivery of the coupons or notes themselves, thus ratifying the payment of the money without producing the written evidence of debt. Thus, while the evidence in this case could not as a matter of law be taken as being conclusive upon this question, still, in our opinion, it was a question for the jury to determine whether the course of dealings between the defendant and the plaintiff, through the agent, established such implied agency, where it was shown that the note was negotiated by the alleged agent and made payable at the chartered bank of which he was cashier, and where in the course of previous dealings with the defendant the alleged agent received payment of various interest notes without having possession of them, and that these payments were subsequently ratified by the principal and the interest notes thereafter delivered.

3. While the evidence was conflicting, we think that the jury were authorized to find that the payment in dispute actually reached the hands of Salsbury, who had the undoubted right to receive it. If this be true, then, irrespective of the question as to Armstrong's right to collect it, this would conclude the rights of plaintiff. As was said in *Bank of University* v. *Tuck*, supra: "If the holder actually received the money collected by the payee on the note, this should be an end of the matter."

*Judgment affirmed. Wade, C. J., and Luke, J., concur.*