*S. T. Wingfield, Roy D. Stubbs,* contra.

---

### 6107. HANCOCK *v.* EMPIRE COTTON OIL COMPANY.

1. Testimony of one whose name appears as the maker of a negotiable note, that he signed and delivered it merely as an accommodation maker, without filling various blanks therein, and with the understanding that the person to whom he delivered it might thereafter fill the blanks and insert a certain amount and use the note for that person's benefit, but only in the event that the signer should thereafter consent to the completion of the note and to its use, and that thereafter a larger amount was inserted and the note used without his knowledge or con-

sent, would not support a plea of non est factum, or constitute a valid defense against a bona fide transferee for value and before maturity. When one of two innocent persons must suffer by the act of a third person, he who puts it in the power of the third person to inflict the injury must bear the loss.

2. Where the signer of a note containing blanks deliver it to a person not authorized to fill the blanks or to use the note until thereafter empowered to do so by the maker, but who, exceeding his authority, does fill out and use the note, evidence that the maker accepted from the payee named therein a note payable to himself, to indemnify him against loss on the note signed by him, might relate back and amount to a ratification of the act of the person to whom he intrusted the incomplete note.

3. Where the title of the holder of a note, transferred by indorsement, is questioned by a proper plea under oath, and the genuineness of the indorsement itself is so denied, proof is necessary on the part of the plaintiff before the note thus challenged can be introduced in evidence. If, however, without proof to establish the title of the holder or the validity of the indorsement, the note is offered in evidence with an apparently sufficient indorsement thereon to convey title to the holder, and no objection to the note, with the indorsement thereon, is urged by the defendant, the failure to object will amount to consent on his part to the introduction of the note, and to a waiver of his right to exact proof of the indorsement, and he can not for the first time raise the objection in this court.

4. Where the holder of a bill or note has acquired it as collateral security for a debt and is entitled to recover thereon, the extent of his recovery is limited to the amount of that debt, if there be a valid defense against the party transferring it to him. It is only pro tanto that he is entitled, as a bona fide holder, to stand upon a better footing than his transferrer. Such a holder can recover against an accommodation party no more than the consideration actually advanced or the debt due him by the person for whose obligation he accepted the collateral; but in the absence of proof to the contrary, the holder of an accommodation paper, transferred to him as collateral for the debt of the person who transferred it, will be deemed to have advanced the full amount of the paper, or to hold against his debtor a claim equal to or in excess of the paper.

5. The court did not err in directing a verdict in favor of the plaintiff.

DECIDED SEPTEMBER 23, 1915.

Complaint; from city court of Jefferson—Judge Johns. October 1, 1914.

*P. Cooley, H. H. Dean,* for plaintiff in error.

*Green, Tilson & McKinney, L. G. Fortson, J. S. Ayers,* contra.

WADE, J. The Empire Cotton Oil Company brought suit against Hancock on a promissory note signed by him, payable to the order of Carr, Boyd & Company, and indorsed "Carr, Boyd & Company,

per B. F. Carr," dated June 17, 1912, and due January 1, 1913, for $856.25 and interest from maturity at 8 per cent. The defendant interposed a plea under oath at the first term, alleging that he signed in blank two notes and delivered them to B. F. Carr, but that neither of them was to be filled out by Carr for the sum of $856.25, and that neither was to be used until further notice, and that, before the notes were filled out and made payable to any one, Carr was notified not to use them. The plea further alleged that the defendant "did not execute any note to Carr, Boyd & Company in any sum whatever," and that the note sued upon was not in the hands of the plaintiff as a bona fide holder for value; that there was no consideration for the note at the time it was made, and the plaintiff had notice of this fact at the time it accepted the note; and further that the note was never indorsed by Carr, Boyd & Company to the plaintiff and did not then bear the genuine indorsement of Carr, Boyd & Company, and the plaintiff held no legal title thereto. By amendment the defendant struck the word "delivered" in the original plea, and substituted in lieu thereof the word "handed," so that the allegation in the plea amounted to a statement that the defendant signed two blank notes and "handed" the same to B. F. Carr, instead of "delivering" the same. By further amendment the defendant alleged, that the note sued upon was never executed by him, or by any person by him authorized, and was not his act or deed; that he did not fill out the note and did not authorize any one else to fill it out, either for $856.25 or for any other amount; "that on or about the 16th day of June, 1912, he signed, or placed his name on what purported to be a blank note, without any amount being specified therein, or containing any writing whatever, and being nothing but a blank paper with this defendant's name placed thereon; that he handed said paper, or blank alleged note, to B. F. Carr to hold and keep as an escrow, awaiting further instructions from this defendant, and with positive instructions that the said B. F. Carr should not fill in said alleged note in any amount whatever, or use the same in any way unless thereafter authorized by this defendant to do so, and that the said B. F. Carr then and there, at the time of receiving said note, agreed with this defendant that he would not fill in said alleged blank note, or blank paper, for any amount, or put any writing whatever upon said alleged note, unless and until

authorized by this defendant that he could do so;" that a day or two after the execution of this note in blank, he notified B. F. Carr to return the note to him or to destroy it, and not to fill it out for any amount whatever, or to use it "in any way, shape or form whatever," and that Carr then and there notified him that he would not use the note, and had not used it, and would destroy it as directed. The plea expressly denied that the defendant had ever delivered the note to Carr or considerd it delivered to him, and alleged that Carr was notified "that he was to hold the same as an escrow purely, as agent of defendant, and not to fill in the same or use the same in any way until permitted to do so by this defendant," and the filling out of the note, the indorsement of the same, and the delivery thereof to the Empire Cotton Oil Company, was without any authority on the part of the defendant, without any consideration or knowledge on his part, and was a fraud upon him; that the Empire Cotton Oil Company paid nothing for the note, was not an innocent purchaser or innocent holder of the same, and the note was without consideration either as between the defendant and B. F. Carr, or Carr, Boyd & Company, or as between the defendant and the Empire Cotton Oil Company; that the defendant did not owe B. F. Carr, or Carr, Boyd & Company, any sum whatever at the time the said note was signed, and had not become indebted to them in any sum since that date; that he received no value for the said note, and never delivered it except as an escrow; that the note was void for want of consideration, void for want of delivery, and void because it was not the instrument signed by the defendant, as the writing of the name, the date, the amount, the rate of interest, and any writing therein, was without authority and against the positive instructions of the defendant; that the Empire Cotton Oil Company merely claimed to hold this note as collateral for indebtedness already existing between Carr, Boyd & Company and the Empire Cotton Oil Company, and the said Empire Cotton Oil Company paid nothing for the note and had no right to hold or collect it from the defendant.

On the trial of the case the note sued upon was offered in evidence without objection by the defendant, and appeared to have been signed by the defendant, to be payable by its terms to the order of Carr, Boyd & Company, to be dated June 17, 1912, and due January 1, 1913, to provide for interest from maturity at the

rate of 8 per cent. per annum, and for 10 per cent. as attorney fees, and to be indorsed "Carr, Boyd & Company, per B. F. Carr." It was shown by the testimony of the defendant that on or about the date on which the note sued upon was executed, B. F. Carr, of the firm of Carr, Boyd & Company, who was connected with the defendant by marriage, came to the defendant's home, and, after stating that he was in financial straits and needed money, requested the defendant to sign two accommodation notes payable to his firm; that the defendant complied with the request, to the extent that he appended his signature to two printed blank notes; in which neither the amount to be paid nor any other writing appeared; that he handed these notes to Carr with the distinct understanding and agreement that Carr should hold them until the defendant gave him further notice, the defendant agreeing to call him up by telephone and instruct him on the following day whether to use the notes or not; that in the event he should afterwards agree that the notes should be filled in and used, they were to be filled in for $750 each; that on the following day he went "to town" and called up Carr as agreed, and talked to him over the telephone, recognizing Carr's voice, and then instructed Carr not to use either note, and Carr then and there agreed that he would not do so; that a day or two later he saw Carr in person and Carr told him he had not filled in the notes in question, and agreed that he would destroy or return them to the defendant; that at no time did Carr ever have authority to fill in these notes as his agent or otherwise, but Carr was distinctly informed, when the notes were first delivered to him, that he should not use them without further authority from the defendant, and before they were used he notified Carr that they could not be used; that he neither owed the Empire Cotton Oil Company nor Carr, Boyd & Company any sum whatever at the time the notes were given or afterwards. On cross-examination the defendant testified as follows: "I signed that note; that looks like my signature. At the time it was like this, except it has been filled in in the blank spaces. Carr told me that he wanted to use it when I signed it. I saw him two days later. I was in Jefferson when I called him up, and two days later I saw Mr. Carr and Mr. Carr told me that he thought he had destroyed the notes. I don't remember what I did with the note I took to hold against it. I have the note. I think it is down here at the

Jefferson Banking Company. It is over there or at my house. It was not taken the same day. The note may possibly be in the hands of Col. Cooley [one of the counsel for the defendant]. I can't say positively where the note is. I still have the note. In the beginning I did tell Carr that he could fill the note out for $750; that was the amount that was agreed upon at the time. Instead of filling it out for that amount, gone $126.56 more. Mr. Carr married my cousin."

On redirect and re-cross examination it appeared that some time after the execution of the two notes, one of which is the note sued upon, Carr, Boyd & Company gave to the defendant the note referred to in his redirect testimony as a "counter-note," designed to evidence the liability of Carr, Boyd & Company to the defendant for the amount of the two notes signed by him in blank and delivered to Carr for Carr, Boyd & Company, and to indemnify the defendant against any loss thereon. The defendant again expressly denied that he had ever invested Carr with any authority to fill out the note for $750 (which was actually filled out for $856.25, and thereafter sued upon by the plaintiff), unless Carr should be further empowered by him to do so, and if he allowed Carr to use the note at all, that he was to use it for $750 only. He said: "I did not use any counter-note. I did not get any note from Carr, Boyd & Company at the time this other note was given. At another time I did give Carr, Boyd & Company another note, which they did use; I didn't get a counter-note at the time, but later I did get a counter-note." He said further that at the time he took the counter-note he did not know that the note sued upon was outstanding, but thought it had been destroyed; that then he "took a note from Carr, Boyd & Company covering these notes." He added that it was not his "intention" to take the note given to indemnify him against loss to cover "this $850 note sued on;" that he had "never realized any sum whatever out of any counter note; never realized anything out of the mules or note; . . didn't intend to take that note to cover the $850 note," as he did not know the note sued upon was outstanding, and did not know the other note was outstanding; that he gave two notes, but thought they both had been destroyed; "I don't remember that I took the counter-note to cover this note—I didn't think I did." This witness further said that one Lyle, who appears from the record to have been connected with

or an employee of Carr, Boyd & Company, told him, on a day referred to as "that day," that the note sued upon was in existence, but he could not remember whether this was before he took the so-called counter-note or afterwards; that he did not take the counter-note to protect himself against the two notes which he had agreed with Carr should be filled in for $750 each (in the event he authorized Carr to fill in or use them at all), as he did not consider those papers "out;" that Lyle told him that Carr had used the note sued upon, but Carr, Boyd & Company were going to take care of it the next day and take it up, as they had shipped a car of seed to the Empire Cotton Oil Company.

It was admitted that Carr, Boyd & Company went into bankruptcy on the 12th of November, 1912, and the defendant testified that he had no knowledge until the latter part of October of that year that the note sued upon "had the blanks filled in in any way." Elsewhere in his direct testimony he testified as follows: "When I first handed him the notes I gave him no authority to fill in the blanks, not until he heard from me. I instructed him not to fill in the blanks until he heard from me. In parting with this paper to Mr. Carr I did not intend to deliver that to him as his note. I did not consider it his note until he heard from me." The defendant nowhere stated in his evidence the amount of the note given him by Carr, Boyd & Company, which he denominated a counter-note.

There was testimony from one Hendrix that he was traveling representative for the Empire Cotton Oil Company, and was working for that corporation during the year 1912, and that in July, 1912, the plaintiff company made a seed contract with Carr, Boyd & Company, to purchase seed at Maysville, Georgia, and the plaintiff received the note sued upon from Carr, Boyd & Company as security for a loan made them on June 9, 1912, and that he "did not know anything about its being an accommodation paper when it was taken;" that the note was delivered in the office of the plaintiff by mail, and this he knew of his own knowledge, as he opened the mail himself, and about $3,000 of collateral papers came with this note; that the plaintiff was a corporation, and he was unable to say, of his own knowledge, how many stockholders there were or what the other stockholders knew about the note in question, though he himself did not know anything about the nature of the

paper, and knew the other stockholders did not know, as they would not have accepted it had they known it; that he himself owned 10 shares of stock in the company, which was a $1,500,000 corporation; that he was "familiar with the facts of this transaction, and did not know that it was an accommodation paper."

This concluded the testimony, and, on motion of counsel for the plaintiff, the court directed a verdict against the defendant for the full amount of the note sued upon; whereupon the defendant excepted.

From the undisputed evidence it appears that the note sued upon was an accommodation note, executed and delivered to (or placed in the possession of) B. F. Carr, of Carr, Boyd & Company, as shown by the testimony of the defendant; and one of the controlling questions in the case is whether the title to this note passed to the plaintiff as a bona fide holder, so as to preclude the defendant from setting up as against the holder the secret understanding between himself and Carr at the time the note was signed. It is unnecessary to say that the holder of a note is presumed to be such bona fide and for value, but if either fact is negatived by proof the defendant would be let in to all his defenses. Civil Code, § 4288. Nor is it necessary to refer to the fact that the note sued upon in this case appears, under the evidence, to have been transferred to the plaintiff as security for a pre-existing debt, since the holder of a note as collateral security for a debt stands upon the same footing as a purchaser of such a note. Civil Code, § 4289. "The holder of a note as collateral security, who takes it without notice stands upon the same footing as any other innocent purchaser without notice." *(Bonaud* v. *Genesi,* 42 *Ga.* 639), and one who takes collateral security for a pre-existing debt. is a holder for value. See 2 Enc. Dig. Ga. Rep. 404 (*b*) ; *Harrell* v. *National Bank,* 128 *Ga.* 504 (57 S. E. 869). It is settled by numerous adjudications of our Supreme Court that ordinarily an indorsee of a negotiable instrument is presumed, in the absence of any proof to the contrary, to have become the bona fide holder of the instrument for value and before maturity. See 2 Enc. Dig. Ga. Rep. 405 (6).

Our code·provides that "an indorsement or assignment of any bill, bond, or note, when the same is sued on by the indorsee, need not be proved unless denied on oath." Civil Code, § 4299. In the absence of any legal and sufficient plea of non est factum as to

the execution of the note originally, or as to the indorsement relied upon to convey title to the plaintiff, the introduction of the note in evidence, without more, would have authorized a verdict in behalf of the plaintiff, since there was no proof tending to rebut the presumption raised by law in regard to the instrument sued upon, which appeared on its face to have been given for a consideration and to have been duly transferred by sufficient indorsement to the plaintiff. There was, however, a plea filed under oath at the appearance term, directly bringing into question the validity of the indorsement apparently transferring title to the plaintiff. The defendant made the following plea, to which no demurrer was interposed by the plaintiff: "Defendant further pleads that the said note sued upon was never indorsed by Carr, Boyd & Company to plaintiffs, and does not now bear the genuine indorsement of Carr, Boyd & Company, and that the plaintiffs do not hold a legal title to said note." The sufficiency of this plea to call into question the validity of the indorsement, and the propriety of directing a verdict notwithstanding this plea, will be discussed further on in the opinion.

1. As suggested above, the vital question to be disposed of at the outset of the discussion which follows is whether or not, under the circumstances in proof, the plaintiff acquired such title to the note sued upon, as a bona fide holder, as would preclude the defendant from setting up, as matter of defense, that the note in its present or in any other form was never executed by him, on account of a private understanding between himself and the person to whom he immediately delivered the note after appending his signature thereto. As between the parties, in order to bind the maker of a promissory note, it is necessary that it be delivered, for until the delivery of the instrument no contract arises thereon, and it remains revocable and unenforceable. 4 Am. & Eng. Enc. Law (2d. ed.), 201. While actual or manual delivery is of course not indispensable to the validity of a note, still it must appear that the maker in some way exercised an intention to make it an enforceable obligation against himself according to its terms, by surrendering control over it and intentionally placing it under the control of the payee or of some third person for his use. *Reese* v. *Fidelity Mutual Life Asso.* 111 *Ga.* 482-486 (36 S. E. 637) ; *Hansford* v. *Freeman,* 99 *Ga.* 376 (27 S. E. 706). "As a general rule,

a negotiable promissory note, like any other written contract, has no legal inception or valid existence, as such, until it has been delivered in accordance with the purpose and intent of the parties. There accordingly is no doubt that delivery of a negotiable instrument is necessary to create any liability *as between the immediate parties"* (italics ours). 3 R. C. L. 1025, § 233. "It is familiar law that one in possession of chattels by theft can convey no title to an innocent purchaser. Coin and bank bills, however, are excepted from the rule. As to those, even if feloniously obtained, the holder can convey a good title to an innocent purchaser. And from the highest considerations of public policy, the law also excepts from the rule negotiable instruments acquired for value in good faith before maturity and without notice. Such paper takes the place and performs, to a large extent, the office of money. It is used for the transaction of much the largest part of the business of mankind. It would be most embarrassing, therefore, if every taker of such paper was bound, at his peril, to inquire into the title of the holder, and if he was obliged to take it with all the imperfections and subject to all the defenses which attach to it in the hands of the holder. It has, therefore, become the settled rule that a thief or any other person having possession of such paper fair upon its face can give a holder in due course a good title to it, against all the parties thereto, as well as the true owner. It may be taken, then, to be the well-settled rule of law that the transfer of stolen commercial paper, negotiable by delivery, to a bona fide purchaser, for value, without notice and before maturity, vests him with a good title against all the world. The rule seems to be the same in the case of instruments that have been lost by the owner. The due course holder of a lost or stolen negotiable instrument may recover against the maker and indorsers thereof, and the damage must be borne by the person from whose possession the instrument was lost or stolen." 3 R. C. L. 1000, § 210. Our code provides, that "The seller can convey no greater title than he has himself. The bona fide purchaser of a negotiable paper not dishonored, or of money, or bank-bills, or other recognized currency, will be protected in his title, though the seller had none. There is no 'market overt' in Georgia." Civil Code, § 4118.

In *Harrell* v. *National Bank,* supra, the Supreme Court, in discussing the well-established doctrine that fraud in the procurement

of a note (referred to in section 4286 of our Civil Code) means fraud in the procurement by the holder of the note, and has no reference to the contract out of which the note arises, refers to the opinion by Mr. Justice Lumpkin, in *Grooms* v. *Olliff*, 93 *Ga.* 789, 792 (20 S. E. 655), in which the learned Justice said, by way of illustration: "So, also, a thief who stole a promissory note, or a robber who took it by force from the possession of another, would be guilty of fraud in the ·procurement;" and the court said that counsel for plaintiff in error misapplied this illustration, by contending that if an intermediate indorser, by ·theft ,or fraud, gets possession of a note and transfers it, before due and for a valuable consideration, to a bona fide purchaser, the purchaser would not be a bona fide holder. The court said further: "The context clearly shows that the learned Justice meant that if the holder fraudulently got possession of the note, he would not be a bona fide holder." The court further quoted with approval from Daniel on Negotiable Instruments, to the effect that if a bill or promissory note had been fully completed in form, and signed by the maker, and before delivery was stolen from the possession of the party who signed it, and passed by the thief to a bona fide holder for value in the usual course of business, the purchaser would be a bona fide holder and entitled to recover against the maker; that the maker's signature itself was an assurance that his obligation had been perfected by delivery, and since loss must fall upon one of two innocent parties, it must fall upon the one whose act opened the door for it to enter. The court further said: "A fortiori, if the note has passed out of the possession of the maker into the hands of the payee, and been indorsed by the payee, and surreptitiously abstracted from the payee's possession, or the possession of some one holding it for the benefit of the payee, and has been by such person transferred for value, before due, without notice of dishonor, and in the course of business, the holder would be protected against the original payee." It was held in *Matthews* v. *Poythress*, 4 *Ga.* 287, that "the purchaser of a bill, note, or other negotiable security, transferable by delivery, who takes it before it is due, from one who himself has no title bona fide and for value, acquires a good title;" and that such title would not be defeated by gross negligence, though it might be defeated by mala fides in the purchase, where there was notice, actual or constructive, that the instrument

was not the property of the person who offered it for sale, and a privity with or participation in the fraud upon the true owner by the purchaser. See also *Bealle* v. *Southern Bank of Georgia,* 57 *Ga.* 274; *Thomas* v. *Kinsey,* 8 *Ga.* 421, 430; *Moye* v. *Waters,* 51 *Ga.* 13; Shaw *v.* R. Co., 101 U. S. 564 (25 L. ed. 829); *Walden* v. *Downing Co.,* 4 *Ga. App.* 534 (61 S. E. 1127). It is equally true that "the forgery of a negotiable instrument, or of the indorsement thereon, except in case of ratification or estoppel, nullifies the instrument as to all parties against whom the forgery is committed." 3 R. C. L. 1001, § 211. So also it was the rule of the common law that a fraudulent and material alteration of a promissory note without the consent of the party sought to be charged thereon, whether made before or after the delivery of the instrument, rendered the contract wholly void as against him even in the hands of a bona fide holder, on the principle that parties are liable only on their contracts as made by them, and if the contract has been changed by a material alteration without the privity of the party liable upon it, it ceases to be his contract, and he can no longer be bound thereby, as any contrary rule would encourage fraud and forgery. It is scarcely necessary to say that cases passing upon the alteration of complete instruments are to be clearly distinguished from those ruling upon the effect of filling-in blanks in incomplete instruments. 3 R. C. L. 1003-1004, § 213. Quite a distinction exist between the initial forgery or the material alteration of a completed instrument, and the filling in of blanks in an incomplete instrument by a person to whom it is intrusted by the signer, as is hereinafter more fully discussed.

Again, it is well settled that if a person indorses or signs in blank a negotiable instrument and delivers it to another in order that the latter may raise money thereon, he authorizes the person to whom the note is so delivered to fill in all blanks which are necessary and proper in order to make the instrument a perfect promissory note; and if anything remains to be done in order to give validity to the paper, the blank signature carries with it authority for the holder to render the instrument perfect and effectual. And it has been settled, by numerous adjudications, that where a party to a commercial paper intrusts it to another with blanks not filled, whether it be for the purpose of accommodating the person to whom it is intrusted or of using it for his

own benefit, the paper carries upon its face an implied authority to fill the blanks and perfect the instrument; and as between such a party and innocent third parties, the person to whom it was so intrusted must be deemed the agent of the party who committed it to his custody; or, in other words, it is the act of the principal and he will be bound thereby. See 3 R. C. L. 1012, § 220, and cases there cited. See also, however, in this connection, *Gwin* v. *Anderson,* 91 *Ga.* 827 (18 S. E. 43), and *Farmers Bank* v. *Johnson,* 134 *Ga.* 486 (68 S. E. 85, 30 L. R. A. (N. S.) 697, 137 Am. St. R. 242). "Where a party to commercial paper intrusts it to another with a blank thereon designed to be filled up with the amount, such party is liable to a bona fide holder of the instrument for the amount filled in, though it be larger than was stipulated with the person to whom immediate delivery was made." 3 R. C. L., 1012, § 220.    In 2 Am. & Eng. Enc. of Law (2d ed.), 253, it is said: "It may be stated as a general rule, which is unquestionably applicable to all simple contracts in writing, and, according to some authorities, also to specialties, that where a person intending to enter into a contract delivers a writing containing blanks, evidently meant to be filled, this creates in the receiver, and, at least in the case of negotiable paper, in his transferees, an implied authority to complete the instrument by filling the blanks in the way apparently contemplated by the maker with matter in general conformity to the character of the writing." This right to fill in blanks in general conformity to the character of a writing, without express authority, rests upon an assumption of consent, and the fact that the blanks are so left is construed to imply authority to fill them.   The matter necessary to complete the instrument, as apparently called for by the written or printed words, may be filled in, but nothing can be inserted which would vary or alter its material terms, or be repugnant to what may be expressed therein when the instrument is delivered; and such implied authority to perfect an instrument has been held not to include authority to insert additional terms or stipulations, and of course does not embrace the right to make a new instrument by erasing or altering what is already written or printed in the paper when delivered.   As between the original parties to an instrument, in which blanks have been left, the insertion of material matter in the blanks has the same invalidating effect as any other ma-

terial alteration, and a negotiable instrument will be vitiated by an alteration of this kind in the hands of a transferee with knowledge of the circumstances of the alteration; but the "signer of a negotiable instrument containing blanks which have been filled out in an unauthorized manner and then transferred for value will be bound by the instrument only in the hands of a transferee who had no notice of the alteration. It is a generally accepted doctrine, that even though the authority to fill blanks left in a negotiable instrument has been exceeded, the instrument will nevertheless be enforceable in the hands of a transferee for value, who came regularly by it, without notice of the alteration." 2 Am. & Eng. Enc. of Law (2d. ed.), 254-8, and cases there cited. It has been held that "where one writes out a note or other instrument so as to leave spaces which can easily be filled without exciting suspicion, and such note or other instrument is altered by filling in these spaces, he will have to suffer the consequences of his negligence and be liable to a bona fide holder for value on the altered instrument." 1 Am. & Eng. Enc. Law, 515. And again, "where a party to a negotiable instrument intrusts it to the custody of another with blanks not filled up, whether it be for the purpose of accommodating the person to whom it was intrusted, or to be used for his own benefit, such negotiable instrument carries on its face an implied authority to fill up the blanks and perfect the instrument; and as between such parties and innocent third parties, the person to whom it was so intrusted must be deemed the agent of the party who committed the instrument to his custody." 1 Am. & Eng. Enc. Law, 516. "Filling up the blanks in such a manner as to give the instrument a character entirely different from the intention of the signer, and against his express stipulation, will not invalidate the instrument in the hands of a bona fide holder without notice, if nothing on the face of the paper indicates such changes." 1 Am. & Eng. Enc. Law, 518.

The conveniences and the necessities of commerce require that negotiable instruments should be protected by the same rule which, in the absence of fraud on the part of the holder, confers title to currency or coin by its mere possession. There are additional reasons, arising from or dependent upon relations between parties, which may also shield an innocent holder from defenses based on infirmities in such an instrument and from defects in the title

thereto. The defendant may, for instance, have been guilty of such negligence as to deprive him of the right of protection secured or afforded by other rules of law. Perhaps no rule is superior to the recognized doctrine that one whose negligence influences and induces an act from which injury flows to an innocent person must, as between himself and such other innocent person, suffer the resulting loss. See 3 R. C. L. 998, § 208. This doctrine is clearly recognized in our code, which provides expressly that "when one of two innocent persons must suffer by the act of a third person, he who put it in the power of the third person to inflict the injury must bear the loss." Civil Code, § 4537. It has been held that one who signs his name to a negotiable instrument may be held liable to a bona fide holder because of his negligence in permitting the instrument to get into circulation, even where there was no intention whatever that the person originally placed in possession of the note should be empowered to do anything whatever therewith. Castelo *v.* Barnard, 190 Mass. 260 (76 N. E. 599, 3 L. R. A. (N. S.) 212, and note, 112 Am. St. R. 328) ; 3 R. C. L. 998, § 208. In Shipley *v.* Carroll, 45 Ill. 285, one who signed, simply as a matter of amusement, a note which was thereafter feloniously carried away and put into circulation by the payee without the consent of the maker, was held liable to an innocent purchaser; and this ruling was adhered to in Clarke *v.* Johnson, 54 Ill. 296. In McCormick *v.* Holmes, 41 Kan. 265 (21 Pac. 108), a note which the maker allowed the payee to put in a table drawer in a hotel, on the understanding that it was to be turned over to the landlord and kept by him, was subsequently put into circulation without the knowledge or consent of the maker, and it was held that an innocent purchaser was entitled to recover on the note. It does not definitely appear from the reports of the last named two cases whether or not the decisions were based upon the theory that the defendants were guilty of negligence in permitting the instruments to get into circulation. However, in Salley *v.* Terrill, 95 Me. 553 (50 Atl. 896, 55 L. R. A. 730, 85 Am. St. R. 433), Burson *v.* Huntington, 21 Mich. 415 (4 Am. R. 497), Robb *v.* Pennsylvania Co., 186 Pa. 456, (40 Atl. 969, 41 Atl. 695, 41 L. R. A. 695, 65 Am. St. R. 868), Roberts *v.* McGrath, 38 Wis. 52, and Dodd *v.* Dunne, 71 Wis. 578 (37 N. W. 430), it was assumed that where the maker of a negotiable instrument negligently allowed it to get into circula-

tion, he would be liable to a bona fide holder, upon the ground that he would be estopped by his own negligence to deny a valid delivery.

The general rule, already stated, that when a loss has happened which must fall upon one of two innocent persons, it should be borne by him who was the occasion of the loss, even though no positive fault was committed by him, and more especially if there was any carelessness on his part which caused or contributed to the misfortune, is confined to cases where the party who is made to suffer the loss reposed a confidence in the third person whose acts occasioned the loss, or in some other intermediate person, whose acts or negligence enabled such third person to occasion the loss; and the party has been held responsible upon grounds analogous to those which govern the relation of principal and agent. It is held that the party thus reposing confidence in another, with respect to transactions by which the rights of others may be affected, constitutes that person, as to them, his agent in some sense; and, having held him out as such, or trusted him with papers or indicia of ownership which had enabled him to appear to others as principal, or owner, or as possessed of certain powers, the person reposing the confidence is, as to those who have been deceived by his agent thus constituted, held liable. "The reason is obvious. The maker ought rather to suffer, on account of the fraudulent act of one to whom he intrusts his paper, or who is made his agent in respect of it, than an innocent party. The law esteems him in fault in thus putting it in the power of another to perpetrate the fraud, and requires him to bear the loss consequent upon his negligence:" 3 R. C. L. 1000, § 209.

It may be said that the cases hold, with little, if any, conflict, that at common law an innocent payee, or other person in whose hands a note has its inception as a contract, may recover against one who signs it in blank and delivers it to a third person, who fills up the blanks in a manner different from or in excess of his authority. Some of the cases put the rule on the ground that the payee is a bona fide holder and entitled to protection as such, and others upon the ground of common-law estoppel. In *Moody* v. *Threlkeld,* 13 *Ga.* 55, the defendant was held liable on the ground that the payee was a bona fide holder. In Weidman *v.* Symes, 120 Mich. 657 (77 Am. St. R. 603, 79 N. W. 894), and in Johnston

Harvester Co. *v.* McLean, 57 Wis. 258 (46 Am. R. 39, 15. N. W. 177), the court held the payee to be a bona fide holder, and said that the plaintiff could not be prejudiced by the fact that a blank in the note sued on was filled with a larger amount than the makers, agreed it should be. See Van der Ploeg *v.* Van Zuuk, 13 L. R. A. (N. S.) 490-492 (note); White-Wilson-Drew Co. *v.* Egelhoff, 96 Ark. 105 (131 S. W. 208); Reddick *v.* Young, 177 Ind. 632 (98 N. E. 813); Linick *v.* Nutting, 140 App. Div. 265 (125 N. Y. Supp. 93); Hermann *v.* Gregory, 131 Ky. 819 (115 S. W. 809); *Wilkes* v. *Pope,* 4 *Ga. App.* 36 (60 S. E. 823). Other cases, which also sustain the rule at common law with respect to the right of the innocent payee, or person in whose hands the note first had its inception as a contract, to recover under such circumstances, rest upon the ground of estoppel. See 13 L. R. A. (N. S.) 493, and cases there cited. It is said in a note in L. R. A. 1915B, 144, that under the so-called uniform negotiable instrument law a direct conflict among the cases has arisen as to whether the payee of a note, under circumstances such as are under consideration, is a holder in due course; but it is unnecessary for our purposes to consider this phase of the matter, since that law is not in effect in this jurisdiction. See on the general subject the extensive note in 11 Am. St. R. 318.

It was held in *Moody* v. *Threlkeld,* 13 *Ga.* 55, that "If A signs his name to a blank paper, and delivers it to B, to be filled up by him, for that purpose, A constitutes B his general agent, quoad the filling up the note. And A will be bound, as to a bona fide holder, though B should not act in accordance with the private understanding between A and himself." In *Woolen* v. *Inman,* 33 *Ga.* 41, it was held that "The transferee of a negotiable paper, who receives the same before it is due, can not be affected by any agreement or understanding between other parties to the paper, unless notice of such agreement or understanding is brought home to the transferee." In *Wilkes* v. *Pope,* 4 *Ga. App.* 36 (60 S. E. 823), this court held: "If A signs his name to a blank note and delivers it to B, designating the payee to be filled in the note by B, A constitutes B his agent for that purpose, and A will be bound to a bona fide holder of the note who becomes such before maturity, although B violated the private understanding between A and himself with reference to the note. *Moody* v. *Threlkeld,* 13 *Ga.* 55.

The testimony of one whose name appears as the maker of a negotiable note, that he signed it as surety, with the understanding that another should sign as maker before the *delivery of the note to the payee* [italics ours], the latter having no notice of such understanding, does not support a plea of non est factum, or constitute a defense as against a bona fide transferee for value before maturity. *Cleghorn* v. *Robison,* 8 *Ga.* 559; *Benson* v. *Abbott,* 95 *Ga.* 75 (22 S. E. 127)."

Of course where a note is signed by one as maker or indorser and delivered to the payee with the agreement that it shall not become operative unless some other person or persons shall likewise sign it, such a note in the hands of an original payee may be defended. In the case of *Heitmann* v. *Commercial Bank of Savannah,* 6 *Ga. App.* 584 (65 S. E. 590), the original payee brought suit on the contract and a plea was interposed setting up a parol condition precedent that the note was not to be completed or binding until an additional indorser had signed it, and this court held that plea to be good. The point has been many times ruled upon in similar cases. "In *Bonner* v. *Nelson,* 57 *Ga.* 433, a suit upon a promissory note was resisted by a surety who signed it and left it with his principal, believing and expecting that another surety was to sign also, but whose signature was not procured, the note being delivered by the principal without it. It was held that to make this defense available it must be shown, not only that the instrument was incomplete, but also that the payee had notice of this fact at the time that it was delivered to him." *Moore* v. *Farmers' Mutual Insurance Asso.,* 107 *Ga.* 199-206 (33 S. E. 65). "When the maker of a negotiable paper deposits it with a third person to be delivered on a certain contingency, or for a specific purpose not apparent upon the paper, and such third party violates the trust, and wrongfully makes delivery, the bona fide indorsee before maturity, and without notice, may recover from the maker. If a promissory note be deposited with a third person as an escrow, and delivered to the payee without the maker's knowledge and consent, and without the happening of the condition on which it was to be delivered, the maker is, nevertheless, liable to an innocent holder for value." 3 R. C. L. 1013, § 221.

It is unnecessary to further call attention to the distinction between a note in the hands of the original payee, who received it

subject to a parol condition agreed upon, or of which he had knowl-. edge through himself or agent, as between himself and the maker, and the same note after it has passed from the hands of such a payee, possessed with knowledge as to the conditions under which it was executed into the hands of a bona fide purchaser who obtains it from him or from some other transferee in due course.

In *Hansford* v. *Freeman,* 99 *Ga.* 376 (27 S. E. 706), the agent who delivered the note was the agent of both parties, and received it with the understanding that he was to hold it for delivery until the happening of a particular event, and that if that event did not happen, he was not to deliver it at all. He delivered it to the payee, who, through the knowledge of her agent, had knowledge of the condition under which only the note was to be delivered, and the court held that the maker of the note might set up as against her (not, however, against some innocent holder to whom the payee might have transferred the note) the fact that it had never been delivered, and the conditions under which it was alone to be delivered. The case of *Dixon* v. *Bristol Savings Bank,* 102 *Ga.* 461 (31 S. E. 96, 66 Am. St. R. 193), cited by the plaintiff in error, is entirely different from the case at bar on its facts. In that case a deed to land, left in escrow, was obtained from the depositary by a fraud practiced upon him by the grantee, who had not performed the condition upon which delivery was to be made, the depositary being innocent of any wrong or bad faith, and the court held that no title passed to the grantee or to an innocent purchaser from the grantee. One who signs or indorses a note as surety can not in defense to an action thereon, either by the innocent payee or any other bona fide holder for value, set up that the principal maker, to whom he intrusted the note, delivered it in violation of a condition that a certain other person or persons should first sign or indorse it. *Clarke* v. *Bryce,* 64 *Ga.* 486; *Bonner* v. *Nelson,* 57 *Ga.* 433; Young v. Ward, 21 Ill. 223; Deardorff *v.* Foresman, 24 Ind. 481; Smith *v.* Moberly, 10 B. Mon. 266 (52 Am. D. 543); Bank of Missouri *v.* Phillips, 17 Mo. 29; Massman *v.* Holscher, 49 Mo. 87; Merriam *v.* Rockwood, 47 N. H. 81; Passumpsic Bank *v.* Goss, 31 Vt. 315; Dixon *v.* Dixon, 31 Vt. 450; Farmers' Bank *v.* Humphrey, 36 Vt. 554 (86 Am. D. 671). "A bona fide holder may recover upon a negotiable instrument although it was deposited with a person to be delivered only upon the happening of a certain event or the ful-

filment of a certain condition, which event has never happened, or condition has never been fulfilled." 4 Am. & Eng. Enc. Law (2d. ed.), 335.

In the case under consideration, it is undisputed that the defendant Hancock signed his name to a printed note and turned it over to B. F. Carr with express instructions that Carr should not fill in for any amount or use it until authorized by the maker to do so. Nevertheless, Carr was placed in possession of an instrument purporting to be a note, even though the amount was left blank, and thus was invested by the signer of the note with the necessary indicia of ownership, and placed in a position where he might perpetrate fraud upon an innocent person; and hence, under the great weight of authority which we have referred to above, and under the rulings in *Moody* v. *Threlkeld* and *Wilkes* v. *Pope,* supra, the indorsee who accepted the note with no knowledge even (so far as appears) that it was an accommodation paper, and, so far as the record discloses, with absolutely no knowledge that Carr had exceeded his authority in filling in the note and transferring it, must be treated as an innocent holder and protected against the alleged fraudulent act of Carr in completing the note and transferring it without authority. In the case of *Wilkes* v. *Pope,* supra, the defendant admitted at the trial that he signed the note in question, and offered to testify that he agreed with another person to become accommodation security for the wife of this person at a certain bank for $70 only, and signed the note with the understanding that she was to sign it as principal above his signature, and the note was to be filled in for the sum of $70 payable to a certain named bank, blank spaces being left for that purpose. The agent thus appointed by the defendant disregarded his instructions and agreement, filled in his wife's name as payee instead of that of the bank, and she thereafter transferred the note before maturity, for her own benefit, to another person, for value and without notice. In the case of *Moody* v. *Threlkeld,* supra, the person whose name appeared as the maker of a negotiable instrument pleaded that he signed it as security, with the understanding that, before delivery to the payee, another should sign it as maker; or, in other words, the person to whom he delivered the note, and who he understood was to sign it as maker, had absolutely no authority whatever to deliver it unless it should be completed in accordance with the agree-

ment.   Here there was a condition precedent which it was agreed must be complied with before the person to whom the maker immediately delivered the note was invested with authority to transfer or deliver it to any person whomsoever.   It may be suggested, in passing, that in the present case the defendant Hancock expressly asserted, in his plea, that when he turned over the note in question to Carr, the latter "was to hold the same as an escrow purely, *as agent* [italics ours] of defendant, and not to fill in the same or use the same in any way until permitted to do so by this defendant."   The agency established as a matter of law was thus apparently recognized by the defendant himself.   Even had the indorsee known, at the time the note was transferred to it by Carr, Boyd & Company as collateral security, that the note was merely an accommodation note, this would constitute no defense as against a holder for value, notwithstanding the note had been diverted from the purpose for which the accommodation was given, unless the holder for value had notice that Carr had exceeded his authority as agent of the maker.   See Daniel on Negotiable Instruments (6th ed.), §§ 786-790, and numerous cases there cited.

The rule may appear a harsh one, and yet it is founded on the fairest principles of justice and equity.   Under a contrary rule, if a solvent person were permitted to put in circulation accommodation paper for the benefit of his friends or any others, whom for business reasons or reasons of policy he might desire to assist, without himself incurring liability, all that would be necessary would be to sign such paper, leaving blanks therein to be filled, with the *express* understanding and agreement that the person accommodated should *not* fill in or use such paper until further notice from the maker.   Then if the maker, after so delivering the blank accommodation paper, were to direct that it be not used, but fail, as in this case, to obtain possession of the paper, or to take any steps which might effectually rescind it, persons so accommodated might fraudulently put the paper in circulation, transfer or discount it for a cash consideration, or as collateral security for a pre-existing debt, and thus obtain valuable extensions of time in their indebtedness, and holders who acquired it, relying on the fact that his name was affixed thereto and that he was financially solvent, might be brought to ruin upon proof by the maker that he had never empowered the original payee and fraudulent indorser to complete the

note by filling in the blanks or to transfer the same to any person whatever. If such a rule should be adopted, the safety ordinarily attaching to negotiable instruments in the hands of innocent purchasers would be destroyed whenever greed might prompt designing and unscrupulous persons to impose upon the business world in this manner, and where the maker had not estopped himself by some conduct or admission of his from setting up a defense.

2. From an examination of the evidence (construing the testimony of the defendant most strongly against him) it appears probable that a note to indemnify Hancock against any loss on account of the two notes signed by him and delivered to Carr for possible use by Carr, Boyd & Company was executed by Carr, Boyd & Company, and at some time delivered by them to Hancock. His evidence on this point is somewhat confused and not altogether clear, but it appears that he received a note of this character from Carr, Boyd & Company, which he says he did not think was intended to indemnify him against possible loss on account of the note sued on and the other note which he had signed in blank and turned over to B. F. Carr. If in point of fact Carr had filled in the note sued on, and indorsed it over to the plaintiff in behalf of his firm, and the defendant, when he ascertained that Carr had violated his instructions and had used the note in defiance of such instructions, *then* ratified the act of Carr by accepting a note of Carr, Boyd & Company to indemnify him against loss on the note improperly used by Carr, such ratification might relate back and make the defendant liable upon the note, notwithstanding Carr originally had no authority to fill in or use it, without regard to the principles enunciated in the first division of this opinion. The question of ratification would of course be one for determination by the jury.

3. It is insisted by counsel for the plaintiff in error that even if it be true that the facts pleaded by him and supported by his evidence as to the original signing of the note, and the conditions under it was left in the hands of B. F. Carr, constituted no sufficient defense of non est factum, he filed under oath at the appearance term a plea which distinctly denied that the plaintiff was a bona fide holder for value of the note sued upon, and alleged that it "was never indorsed by Carr, Boyd & Company to plaintiff, and does not now bear the genuine indorsement of Carr, Boyd &

Company, and that the plaintiff does not hold the legal title to said note." Notwithstanding this plea, no direct evidence was introduced on the part of the plaintiff to establish the fact that Carr, Boyd & Company did actually indorse the note to the plaintiff, and the plaintiff insists that without some such proof, the court was not authorized to direct a verdict in behalf of the plaintiff. Section 4299 of the Civil Code provides that "An indorsement or assignment of any bill, bond, or note, when the same is sued on by the indorsee, need not be proved unless denied on oath." At a subsequent term the defendant filed a formal plea of non est factum, which was allowed by the court, over the objection of the plaintiff that it came too late; but the allowance of this amendment by the court is not before us for consideration. Under the ruling in *Bruce* v. *Neal Bank,* 134 *Ga.* 364 (67 S. E. 819), and in the absence of any exceptions pendente lite so far as we are apprised, and of any cross-bill of exceptions by the successful plaintiff, complaining of the allowance of the amendment setting up the plea of non est factum, or alleging any defect in the original plea touching the indorsement of Carr, Boyd & Company, the pleas as filed must be treated as legally sufficient, under section 4299 of the Civil Code. See also *Federal Discount Co.* v. *Carter,* 14 *Ga. App.* 645 (82 S. E. 51). A sufficient plea of non est factum (so far at least as relates to the purported indorsement of Carr, Boyd & Company on the note sued upon) being filed, the question remains whether the court might direct a verdict in the teeth of such a plea, without even slight evidence to support the fact and validity of the indorsement. "Unless denied on oath an indorsement need not be proved, although the name of the indorser purports to have been signed by an agent, and the action is against the maker." *Neal* v. *Gray,* 124 *Ga.* 510 (4), 511 (52 S. E. 622). But "where the execution of a note is denied by a plea of non est factum, the note will not be received in evidence until some extrinsic evidence of its execution has been submitted." *Patton* v. *Bank of LaFayette,* 124 *Ga.* 965 (5), 971 (53 S. E. 664, 5 L. R. A. (N. S.) 592, 4 Ann. Cas. 639). As already held herein, based on the ruling in *Wooten* v. *Inman,* 33 *Ga.* 41, the evidence offered would not support a plea of non est factum, as to the original execution of the note, and the plea itself was insufficient; and consequently the note was admissible in evidence, even had it been objected to, *unless* it was inadmissible in behalf

of the plaintiff in the face of a plea calling into question the validity of the indorsement thereon, and of the plaintiff's title thereto, without some evidence tending to show title in the plaintiff and tending to establish the genuineness of the indorsement. "Proof of a paper offered in evidence is always necessary when its execution is denied in a plea of non est factum." *Paulk* v. *Creech,* 8 *Ga. App.* 738 (2), 740 (70 S. E. 145). "When a plea of non est factum is filed under oath to a suit on a note, the burden is upon the plaintiff to prove the execution of the note sued on. . . The plaintiff must prove the execution of the note sued on, before the presumption of law would arise that he was a bona fide holder for value." *Wilson* v. *Barnard,* 10 *Ga. App.* 98 (5, 6), 99 (72 S. E. 943). It appears from the evidence set out in the bill of exceptions that the note sued upon in this case was introduced in evidence, notwithstanding the plea denying the title of the plaintiff thereto and the genuineness of the indorsement of the original payees; and, so far as the record discloses, the note was so introduced without objection on the part of the defendant. It was held by this court in *Sheffield* v. *Johnson County Savings Bank,* 2 *Ga. App.* 221 (58 S. E. 386), that no particular form of signature is necessary to the formal indorsement of a negotiable instrument, and that a seal is unnecessary to its sufficiency, whether it be that of a private person or a corporation. The note under consideration was payable to the order of Carr, Boyd & Company, and was indorsed private person or a corporation. The note under consideration was sufficient in form to convey title to any bona fide holder; and when the note, with all entries thereon, was introduced in evidence by the plaintiff, it was before the court for consideration for all purposes, notwithstanding the plea calling in question the indorsement under which the plaintiff claimed title, and the absence of any proof on the part of the plaintiff tending to establish the validity of the indorsement. The failure of the defendant to make objection to the introduction of the note was a waiver of his right to insist upon proof of the indorsement brought into question by his plea; and he can not be heard to make objection for the first time here. The note, being apparently indorsed by the original payee and being placed in evidence by one who was, so far as the testimony disclosed, a bona fide holder for value, without knowledge of any existing infirmity, carried with it all the presumptions to which it was entitled under

the law, and prima facie authorized the return of a verdict for the amount apparently due by its terms.

4. It is insisted by able counsel for the plaintiff in error that, as the evidence in behalf of the plaintiff showed that the note sued upon was transferred to it as collateral security for certain advances, and as the proof showed without dispute that it was an accommodation paper, the plaintiff could only recover the amount of his debt against Carr, Boyd & Company, secured thereby; and if the amount due to the plaintiff by Carr, Boyd & Company was less than the amount of the note sued on, the plaintiff could not obtain judgment for the full amount of the note, but his recovery would be limited to the amount of its debt secured thereby. "That a holder obtained paper by way of pledge, or as collateral security for advances, does not affect his bona fides; but he can recover only the amount of the debt secured." 2 Am. & Eng. Enc. Law, 391. "When it appears that the bill or note was acquired by the holder as collateral security for a debt, and he is deemed entitled to recover upon it, he is still limited to the amount of the debt which it secures, if there be a valid defense against his transferrer, being regarded as, at all events, a bona fide holder, and entitled to stand upon a better footing only pro tanto. Thus such a holder could recover against an accommodation party no more than the consideration actually advanced; *but in the absence of proof he will be deemed to have advanced the full amount of the paper*" (italics ours). 1 Daniel on Negotiable Instruments (6th ed.), 1000 § 832 (a), and cases there cited. It was held in *Hatcher* v. *Independence National Bank, 79 Ga.* 547 (5 S. E. 111), that "If notes were sued on by one who took them as collateral security, and the defendant had a valid defense against the original payee, the holder could recover no more than the amount of the debt which the collateral secured." In the decision the Supreme Court quotes with approval from Daniel on Negotiable Instruments as follows: "When it appears that the bill or note was acquired by the holder as collateral security for a debt, and he is deemed entitled to recover upon it, he is still limited to the amount of the debt which it secures, if there be a valid defense against his transferrer, being regarded as at all events a bona fide holder, and entitled to stand upon a better footing only pro tanto." See also *Bank of the University* v. *Tuck, 96 Ga.* 456 (23 S. E. 467).

It is clear that, in the absence of any proof to the contrary, the presumption of law which attaches to a note in the hands of an innocent holder for value authorized the legal conclusion, notwithstanding the absence of evidence disclosing the amount of the debt still due the plaintiff, that this amount equaled or exceeded the amount of the collateral note in its hands which formed the basis of the suit. The presumption that the note was originally transferred for value attached to the note in the hands of the holder, and the presumption that it was held for value, where transferred as security for an existing debt, or that the consideration authorizing its retention by the holder was sufficient, yet existed in behalf of the holder, and authorized a recovery in its name for the full amount of the note, unless the accommodation maker had in some way demonstrated that Carr, Boyd & Company did not then owe to the plaintiff the full amount of the note. Under the evidence that the defendant was merely an accommodation maker, the original payee could, of course, have recovered nothing against the defendant in a suit instituted in behalf of the original payee, and therefore the defendant had a perfect defense to whatever (if any) part of the note was not necessary to pay off and discharge the indebtedness of Carr, Boyd & Company to the plaintiff, secured thereby. There was no proof tending to show that Carr, Boyd & Company owed less to the plaintiff than the full amount represented by the collateral note of the defendant.

5. It follows from what is said above that the court did not err in directing the verdict complained of. *Judgment affirmed.*